# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:

TRIGEANT, LTD.,

      Debtor.

_____/

Case No.: 13-38580-EPK

Chapter 11 Case

## DEBTOR'S EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE WHY BTB REFINING LLC SHOULD NOT BE SANCTIONED FOR WILLFULLY VIOLATING THE AUTOMATIC STAY

> **Basis for Emergency Relief: The Debtor requests an emergency hearing on this motion because the Refinery (as defined herein) is currently being dismantled by the putative secured creditor, BTB (as defined herein). If BTB is not required to immediately stop its willful violations of the automatic stay and restore the Refinery to its pre-petition condition, the Debtor's estate will be irreparably harmed and there is a real risk that serious environmental violations will occur.**

Trigeant, Ltd. ("Trigeant" or "Debtor"), requests that this Court require BTB Refining, LLC ("BTB") and any other directly culpable persons to show cause why they should not be sanctioned pursuant to 11 U.S.C. §§105(a) and 362 for willfully violating the automatic stay provisions of 11 U.S.C. §362 *et seq*. Notably, very shortly after Trigeant's filing for bankruptcy protection, BTB received two separate written notifications of the filing of the bankruptcy, both of which advised of the imposition of the automatic stay. Nevertheless, after receipt, BTB proceeded to take actions in violation of the automatic stay.

As the Court will learn, Trigeant owns a refinery, and the overriding issues in this bankruptcy will relate to the ownership and operation of the refinery. BTB's actions which violate the stay are calculated to leave Trigeant with an unusable facility. Indeed, reducing the value of the refinery benefits no creditor *except* BTB. BTB's clear goal is to lower the value of

the refinery to allow it to obtain ownership and control of the refinery and therefore, derail this bankruptcy.  BTB's action is adverse to all *other* creditors as the bankruptcy presents the only realistic hope for the employees of the refinery and the non-BTB creditors to be paid on account of the claims they hold.

## BACKGROUND FACTS

**(a)**     **The Parties.**

1.     On November 27, 2013 at 2:48 p.m. (the "Petition Date"), Trigeant commenced a voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. [D.E. 1]. Trigeant is a debtor in possession and owns an asphalt refinery in Corpus Christi, Texas (the "Refinery").

2.     Trigeant was formed as a Florida limited partnership in Florida in May 2001. The sole general partner of Trigeant is Trigeant LLC, a Florida limited liability company. Trigeant LLC holds a 1% ownership interest in Trigeant. The remaining ownership interest is held by Trigeant Holdings Ltd., another Florida limited partnership ("Holdings LTD").  Holdings LTD is in turn owned 1% by its sole general partner, Trigeant Holdings LLC ("Holdings LLC").  The remaining 99% of Holdings LTD is owned by four individuals: 29.25% by Harry Sargeant, III ("Harry"); 29.25% by Harry Sargeant II ("Senior"); 29.25% by Daniel Sargeant ("Dan"); and 12.25% by James Sargeant ("Jim").  Senior is the father of Harry, Dan and Jim. [1]

3.     Accordingly, Senior, Dan and Jim ultimately own and control 70.0425% of the Debtor and its various corporate parents.  They voted unanimously to authorize Trigeant's filing for Chapter 11 bankruptcy protection.

---

[1]  Trigeant submits to the Court, as a matter of candor and not to enflame an already delicate and difficult situation, that there is presently a high degree of animosity between Senior, Dan and Jim, on one hand, and Harry, on the other.  There are pending at least five separate lawsuits where Senior, Dan and Jim and entities they own and control are pitted against Harry.  Those cases are not, by and large, relevant to this motion. However some or all of them may eventually be brought before this Court for determination and even if they are not, it is likely that the Court will hear about them.

4.      In 2004, Harry had become the Manager of Trigeant Holdings, LLC and as such, he controlled the operations of the refinery.  He was removed from this position by an Action of Members on February 19, 2013.   Notwithstanding Harry's removal from managerial responsibilities, and his abandonment of operational control of the Refinery, BTB has taken deliberate actions, as further described below, that if uncorrected will cause irreparable harm to the Refinery.

        **(b)**      **The PDVSA Relationship With Trigeant.**

5.      In late 2002 and early 2003, during Harry's management of Trigeant, he caused Trigeant to purchase 7 cargos of crude oil under a Supply Contract with PDVSA Petroleo S.A., the Venezuelan national oil company ("PDVSA").   Harry then directed Trigeant to not pay PDVSA for the crude oil cargos.  Instead, Harry diverted the proceeds from the sales of the resulting asphalt, using those funds to acquire another unrelated business that quickly failed and hemorrhaged $2 million per month until it closed two years later.

6.      Trigeant's non-payment to PDVSA resulted in two arbitration awards being entered against Trigeant and in favor of PDVSA.  The first award was entered on March 10, 2006 in the amount of $17 million (the "First Award").  In order to pay the First Award, Trigeant refinanced the refinery by obtaining a $22 million secured loan from American Capital Financial Services ("AmCap"), with most of the proceeds going to PDVSA to pay off the First Award.

7.      However, on September 24, 2008, PDVSA obtained a second arbitration award against Trigeant in the approximate amount of $35 million (the "Second Award"), which remains unpaid.  The Second Award was confirmed by the Southern District of Florida on November 6, 2009. *See PDVSA Petroleo S.A. v. Trigeant LTD*, 08-mc-81512-DMM Order Granting PDVSA Petroleo's Amended Application to Confirm Final Arbitration Award [ECF No. 34] (S.D. Fla.

Nov. 6, 2009).  The Second Award also included an award of interest at a rate of 18% and remains unsatisfied.

        (c)      **The Fraudulent Transfer by BTB and Harry.**

        8.      Thereafter, in an attempt to prevent PDVSA from collecting against the assets of Trigeant (i.e., the Refinery), Harry, through BTB, a company that he wholly owns and controls, negotiated with AmCap, ultimately purchasing its loan and all collateral security, which included the Refinery.  Having done so, Harry then proceeded to schedule a non-judicial foreclosure sale for the Refinery on March 4, 2008.  The sale was barely publicized, with notice posted at the courthouse and published for a single date in a local publication.

        9.      When PDVSA learned of the foreclosure months later, it sued to avoid the transfer of the Refinery to BTB as a fraudulent transfer. *See PDVSA v. Trigeant, LTD, et al.*, 09-cv-00038 (S.D. Tex. 2009) (the "Fraudulent Transfer Case").  After a trial on the merits, the United States District Court for the Southern District of Texas ("Texas Federal Court") entered judgment in favor of PDVSA and avoided the March 4, 2008 foreclosure.  As a result, Trigeant owns the Refinery as of the date of the Final Judgment by the Texas Federal Court through and including today. *See Findings of Fact and Conclusions of Law* entered by the Texas Federal Court is attached hereto as **Exhibit A**.[2]

        10.     BTB has taken an appeal to the Fifth Circuit Court of Appeals in an attempt to overturn the resulting judgment in the Fraudulent Transfer Case. Similarly, PDVSA has cross appealed, seeking to have the Final Judgment adjudicated in its favor, including equitably subordinating the BTB debt to PDVSA.

        11.     The Refinery's primary operations for the last year have been leasing of its

---

[2] The Texas Federal Court entered its Final Judgment on January 14, 2013. Almost four months after the issuance of the *Findings of Fact and Conclusions of Law*.

storage tanks to Freepoint Commodities Trading and Marketing LLC ("Freepoint") pursuant to a Tank Lease Agreement (the "Lease").  The Freepoint Lease generates about $575,000 per month in revenue.  However, the Lease ended by its own terms on November 30, 2013.  It is the Debtor's understanding and belief that BTB and Freepoint agreed to a further extension of the agreement until December 7, 2013.

### (d)   Present Circumstances Regarding the Refinery.

12.     As a result of rulings by the Texas Federal Court, Harry, through BTB, has continued to have access to the Refinery solely in order to service the Lease with Freepoint. The Lease was entered into prior to the entry of the fraudulent transfer final judgment by the Texas Federal Court. Therefore, at the time the Lease was signed, BTB was the owner of the Refinery. In effect, this arrangement has given BTB complete and unfettered access to the entire Refinery.

13.     During the course of the past nine months, the Texas Federal Court entered two orders, respectively on March 27, 2013 and April 4, 2013, which addressed ownership and management of the Refinery.  These orders, attached hereto as **Exhibits B and C**, make clear that BTB was to return to Trigeant possession of all property it previously foreclosed upon. Further, as noted above, during the pendency of the Fraudulent Transfer case appeal, BTB was to have a right of use to the Refinery to fulfill all obligations owed to Freepoint under the Lease. However, during this period, all funds paid by Freepoint under the agreement were to be submitted to Trigeant, which remained responsible for the safekeeping of the funds and to pay all necessary Refinery expenses.

14.     As the Freepoint lease was coming to an end and Trigeant was once again poised to assume sole and exclusive operational control of the Refinery, Trigeant decided to seek relief from this Court to restructure its obligations in accordance with the Bankruptcy Code.

Concurrently, as BTB also realized that Trigeant would now have exclusive operational control of the Refinery, only days before that event, BTB began the process of dismantling the Refinery to prevent its operation, as described below.

## AUTOMATIC STAY VIOLATIONS
## BY BTB SINCE THE FILING OF THE PETITION

15.     As noted in the attached affidavits of Roberto Finocci and Jose Ramos, after the Petition Date, BTB has taken willful actions to reduce the value of the Refinery as well as to preclude Trigeant's use of the Refinery. BTB's conduct described below occurred notwithstanding its actual knowledge of the Trigeant bankruptcy filing, both from (i) service of a Suggestion of Bankruptcy served upon BTB's counsel by e-mail shortly after the filing of the Petition, followed by (ii) an e-mail letter from Trigeant's counsel, to BTB's counsel, cautioning BTB not to act in any way that would interfere with refinery operations.  (See **Composite Exhibit D and Exhibit E** attached hereto).  Indeed, the very conduct that BTB was warned not to take respecting operation of the Refinery, BTB engaged in anyway.

16.     December 1, 2013, BTB's employees at the Refinery, acting at the instructions of George Salinas, a BTB employee, removed two LACT units from the Refinery.  LACT units are large structures, indeed they are fixtures, and are necessary to transfer crude oil and other products from trucks into the Refinery's tanks for further blending and sales.  Removing the LACT units effectively precludes the receipt of crude oil into the Refinery, so that no asphalt can be produced without the LACT units.  This is particularly damaging to the Refinery, because the specific "Eagle Ford" crude oil that is to be delivered to the Refinery in order to meet the production requirements of Freepoint, (or any other customer for that matter),  cannot now be received at the Refinery.  It is very difficult to timely find and then replace LACT units or even their component parts. The LACT units are expensive, costing approximately $200,000 each.

6

17.     "Heels" comprise a minimum amount of liquid product at the bottom of an asphalt tank, necessary to keep the tank roofs floating.  On December 1, 2003, BTB employees, working at the direction of George Salinas, consolidated the heels that were maintained in several tanks into one tank, and then pumped out the heels from that one tank to another refinery via pipeline.  Consolidating the heels has left the Refinery without heels, and taking this action leaves the Refinery inoperable until the heels are replaced at a cost of several million dollars. Further, removing the heels, combined with "landing the roofs" on the tanks, such as occurred with tanks 301, 302, 305 and 307, also creates a potential environmental hazard and creates a reportable event to the EPA as a violation of its air quality permits.

18.     Trigeant is informed and believes that BTB is on the verge of also shutting down the boilers at the Refinery.  If this occurs, the Refinery would not be able to operate for some period of time, and at a material cost to restart the boilers.  In fact, last week, BTB provided to Trigeant's local counsel in Texas, a draft motion it intended to file in the Fraudulent Transfer Case that sought to vacate the two orders described in paragraph 12 above that addressed ownership and management of the refinery.  The motion was not filed by BTB prior to the filing of Trigeant's bankruptcy, but BTB's own words in paragraph 5 of that draft motion, are particularly poignant regarding BTB's intent to shut down the boilers and further harm the Refinery:

> For example, the Refinery's boiler will have to be shut down, which will cause the loss of every mechanical seal on every pump in the facility that handles heavy oil or asphalt. Over time, the boiler's internal parts will corrode and pit. Additionally, many of the pumps in the Refinery are on an oil mist system. Without it, bearings will be exposed to moisture, and will develop rust, which in turn, will lead to pump failures. The Refinery's electric heat tracing will be deactivated. The heat tracing is used to maintain heat in the lines. If any residual product is in the lines, without the heat, the product will set up and will not likely become liquid again. Also, the waste water system will be shuttered. Without feed, the microbes in the system will die, and new ones will have to be purchased

7

if the system is to be restarted. The vacuum tower is under a natural gas purge that will cease when the Refinery is shuttered. Without the purge, the tower is open to corrosion and pitting. Without monitoring of the Refinery, rain water and discharge can fill the dikes, and there is a potential for floating the empty tanks. Of course, without monitoring or security of some type, the Refinery is open to vandalism and theft.

19.    Trigeant is prepared and willing to provide all necessary operational support to ensure that the Refinery remains intact and does not deteriorate.  The shutdown of the boiler constitutes an action, possibly an irreversible action "of control of property of the estate" and as such the Debtor requests that this Court confirm that any shut down of the boiler constitutes a violation of §362(a)(3).  Indeed, there are innumerable acts of sabotage that BTB may undertake to disable some or all of the operations of the Refinery. These are precisely the type of actions that are quintessential violations of the automatic stay.

20.    Any single event of removing the LACT units, turning off the boiler or consolidating the heels, and then emptying them out would prevent the Refinery from operating. Each of these actions is violation of the automatic stay. However, when combined, these actions demonstrate a concerted effort to leave Trigeant as an unusable facility that materially impairs the ability of the Debtor to reorganize for the benefit of the *entire* creditor body.  Until these willful actions are reversed it is virtually impossible for the Refinery to conduct its day to day business. Moreover, BTB's intentional act to land the roofs could cause an environmental accident which may not be covered under the relevant insurance policy.

21.    All of these actions constitute a violation of the automatic stay of 11 U.S.C. §362(a).

**ARGUMENT**

**VIOLATION OF AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362**

22.    The law in the Eleventh Circuit is well settled that "[a]ctions taken in violation of the automatic stay are void and without effect." *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982).  Pursuant to 11 U.S.C. § 362(a), upon the commencement of the case, the automatic stay comes into effect. *See* 11 U.S.C. § 362(a). The automatic stay enjoins, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Judge Cristol has held:

> The automatic stay of §362(a) applies by its terms not only to actions against the debtor ... but also to actions seeking to obtain property of the bankruptcy estate." *Amedisys, Inc. v. National Century Financial Enterprises, Inc. (In re National Century Financial Enterprises, Inc.),* 423 F.3d 567, 578 (6th Cir.2005). **"[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the automatic stay provision**."

*In re Tradewinds Airlines, Inc.,* 2009 WL 393858 *5 (S.D. Fla. 2009) (quoting *Licensing by Paulo, Inc. v. Sinatra,* 126 F. 3d 380, 392 (2d Cir.1997)).

**(a)    BTB Violated the Automatic Stay and BTB Must Remedy its Violations.**

23.    As the facts clearly show, BTB took actions after the filing of the Petition that have had a material and continuing detrimental impairment to the operation of the Refinery.  A creditor has "an affirmative obligation to take actions to correct the violations upon learning of the automatic stay." *Henkel v. Lickman, (In re Lickman)*, 297 B.R. 162, 193 (Bankr. M.D. Fla. 2003); *In re Allied Holdings*, 355 B.R. 372, 379 (Bankr. N.D. Ga. 2006)(holding that creditor has affirmative duty to remedy automatic stay violations once they are on notice); *Keen v. Premium Asset Recovery Corp. (In re Keen)*, 301 B.R. 749, 753 (Bankr. S.D. Fla. 2003)("this Court finds

9

that once notice was given that bankruptcy relief had been filed, the Defendants had an affirmative duty to undo the violation of the stay. Several courts, including those in the Southern District of Florida, have held that the failure to take action to undo an innocent violation of the automatic stay constitutes a willful violation of the stay.").

24.    Despite being provided <u>two</u> separate written notices of the automatic stay, one of which expressly warned BTB not to land the roofs on the tanks, BTB went the exact opposite way.  In fact, rather than remedying any of its violations, BTB further exacerbated them by working its employees through the Thanksgiving weekend solely to assure the Refinery could not operate going forward.

### (2)    The Estate is Entitled to Damages.

25.    Under Eleventh Circuit precedent, the bankruptcy court may, under §105 of the Bankruptcy Code and under its inherent equitable powers, enforce the automatic stay even when the debtor is a corporation, despite the language of § 362(k)(1), which provides a remedy for a stay violation only to "individuals." *Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1553-55 (11th Cir. 1996).  Indeed, pursuant to § 362(k), actual damages, including costs and attorneys' fees "shall" be awarded to an individual injured by a willful violation of the automatic stay. 11 U.S.C. § 362(k)(1). According to the Eleventh Circuit, a willful violation occurs where: (1) the party knew that the automatic stay existed and (2) the intended actions violated the stay.  *Hardy by & Through IRS v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996) (applying the test from *Jove Engineering, Inc* to willful violations of the discharge injunction).

26.    There is little doubt in this case that BTB was aware of the automatic stay within 50 minutes of the filing of the Bankruptcy—if not sooner. Similarly each of the actions discussed herein taken after the petition violated the automatic stay. Accordingly, the inescapable result is

that the actions of BTB are willful violations of the automatic stay.

**CONCLUSION**

27.     The automatic stay is one of the most important protections available to a debtor. In this case it was material to ensure that the Trigeant estate was not dismembered by BTB's intentional wrongful conduct, initiated by individuals with scienter, to do everything possible to disrupt Trigeant's interest in the Refinery.

28.     Trigeant is entitled to recover "actual damages, including costs and attorney's fees" for willful violations of the automatic stay. *See generally Carver v. Carver,* 954 F.2d 1573 (11th Cir. 1992) (referring to former Section 362(h)); *see also Jove Engineering, Inc., supra.* As a result of BTB's (and other individuals) stay violation, the Trigeant estate is now at risk for suffering millions of dollars in damages.  BTB must be compelled to restore the Refinery to its prior operating state and pay damages to the estate.  Any individual who directed this violation of law must also be held accountable for their willful actions.

**WHEREFORE**, Trigeant respectfully requests that the Court enter an Order:

 (a) requiring BTB and any such individuals involved to immediately restore or replace any equipment or material removed or disabled from the Refinery necessary to return it to full operating condition;

(b) confirm that shutting down the boiler or any similar action constitutes a violation of the automatic stay;

(c) assessing sanctions, including but not limited to attorneys' fees and costs jointly and severally against BTB and any individuals who directed or approved the actions that constitute violations of the automatic stay;

(d) confirming that the automatic stay prevents BTB or any individual or entity from

11

taking any action that would further damage or disrupt operation of the Refinery; and

(e)  any other and further relief as may be just and proper.

Dated: December 4, 2013.                    Respectfully Submitted,

BERGER SINGERMAN LLP
*Counsel for Trigeant, Ltd.*
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301
Direct:  (850) 521-6705
Fax:   (850) 561-3013

By:    /s/  Lewis Martin Killian
        Lewis Martin Killian, Jr.
        Florida Bar No.  219452
        lkillian@bergersingerman.com

        Paul Steven Singerman
        Florida Bar No. 378860
        Direct Line (305) 714-4343
        psingerman@bergersingerman.com

        Charles H. Lichtman
        Florida Bar No. 501050
        Direct Line (954)712-5138
        clichtman@bergersingerman.com

        Isaac Marcushamer
        Florida Bar No. 60373
        Direct Line (305) 714-4376
        imarcushamer@bergersingerman.com

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic transmission on this 4th day of December, 2013, through the Court's CM/ECF system to all parties on the attached CM/ECF Service List.

By:   /s/  Lewis M. Killian, Jr.
      Lewis M. Killian, Jr.

## CM/ECF Service List

- Donald E Christopher on behalf of Creditor PDVSA Petroleo, S.A.
  dchristopher@bakerdonelson.com, sdenny@bakerdonelson.com;bkcts@bakerdonelson.com

- Isaac M Marcushamer, Esq. on behalf of Debtor Trigeant, Ltd.
  imarcushamer@bergersingerman.com,
  fsellers@bergersingerman.com;efile@bergersingerman.com

- Office of the US Trustee
  USTPRegion21.MM.ECF@usdoj.gov

- Paul Steven Singerman, Esq on behalf of Debtor Trigeant, Ltd.
  singerman@bergersingerman.com,
  mdiaz@bergersingerman.com;efile@bergersingerman.com

- Charles W Throckmorton, Esq on behalf of Creditor BTB Refining, LLC
  cwt@kttlaw.com, lf@kttlaw.com;ycc@kttlaw.com

**EXHIBIT "A"**

5353963-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-38 |
| | § | |
| TRIGEANT, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

This suit arose out of the transfer of an asphalt refinery located in Corpus Christi, Texas from Defendant Trigeant, Ltd. to Defendant BTB Refining, LLC. (BTB) through a foreclosure sale on March 4, 2008.  Plaintiff alleges that the transfer was constructively and actually fraudulent under the Texas Uniform Fraudulent Transfer Act (TUFTA). This cause proceeded to a bench trial, which concluded on May 21, 2012.  Pursuant to FED. R. CIV. P. 52(a), after hearing all the evidence, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

**A.    Parties**

1.    Plaintiff PDVSA Petroleo S.A. is a business entity formed and existing under the laws of the Bolivarian Republic of Venezuela, with its principal place of business in Caracas, Venezuela.  Its principal business activities include producing, supplying, and selling crude oil and other petroleum products around the world.

2.    Trigeant, Ltd. is a limited partnership.  It has a single general partner, Trigeant, LLC.  Steve Roos served as the manager of Trigeant, LLC and was also in charge of operations at Trigeant, Ltd.'s Corpus Christi refinery.

3.     From March 6, 2007 through April 13, 2008, Trigeant Holdings, Ltd. owned
       98.9% of Trigeant, LLC.  Trigeant Holdings, Ltd. was 99% owned by Harry
       Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II.

4.     Trigeant Holdings, LLC was the general partner of, and therefore, in control of
       Trigeant Holdings, Ltd.  Harry Sargeant, III was the manager of Trigeant
       Holdings, LLC.

5.     From March 6, 2007 through April 13, 2008, Harry Sargeant, III, Daniel Sargeant,
       and Harry Sargeant, II each owned 29.25% of Trigeant Holdings, LLC and James
       Sargeant owned 12.25%.

6.     BTB was formed on December 10, 2007.  Harry Sargeant, III is the 100% owner
       and sole member of BTB.  Harry Sargeant, III exercises exclusive control over
       BTB.

**B.     First and Second Arbitration Proceedings**

7.     In December 2002, Plaintiff and Trigeant, Ltd. entered into a Supply Agreement
       for the supply of crude oil to Trigeant, Ltd.'s Corpus Christi refinery.

8.     Soon after, the Supply Agreement was suspended when a strike in Venezuela
       caused Plaintiff to invoke the agreement's force majeure clause.

9.     During the period of time when the Supply Agreement's force majeure clause was
       invoked, Plaintiff sold Trigeant, Ltd. three shipments of crude oil on the spot
       market.  In other words, the shipments of crude were not purchased pursuant to the
       Supply Agreement, but through an open commodities exchange.

10.    In April 2003, a dispute arose between the parties over the price to be paid for
       shipments of crude purchased under the Supply Agreement.

11.    On September 10, 2004, Plaintiff initiated arbitration proceedings against
       Trigeant, Ltd. (First Arbitration Proceedings) pursuant to the terms of the Supply
       Agreement.

12.    On March 10, 2006, Plaintiff obtained an arbitration award (First Arbitration
       Award) against Trigeant, Ltd. for approximately $17 million.  This First
       Arbitration Award resolved the parties' dispute with regard to the shipments of
       crude purchased pursuant to the Supply Agreement.

13.    Disputes remained, however, with regard to the three shipments of crude oil

purchased from Plaintiff on the spot market. Plaintiff demanded payment for the shipments, and Trigeant, Ltd. claimed Plaintiff had committed antitrust violations.

14.   On August 29, 2007, Plaintiff initiated the Second Arbitration Proceedings against Trigeant, Ltd.

15.   On August 24, 2008, Plaintiff obtained a Second Arbitration Award against Trigeant, Ltd. for approximately $35 million. (P47.) As of April 2012, the total amount owed by Trigeant, Ltd. on the Second Arbitration Award, including interest and costs, was approximately $47 million.

## C.   AmCap Loan

16.   In the Fall of 2006, Trigeant, Ltd. utilized a mortgage broker, Blossom Street Capital, to find potential financing sources for an asset-backed loan which could be secured by a mortgage on its refinery.

17.   In December 2006, American Capital Financial Services, Inc. (AmCap) agreed to loan Trigeant, Ltd. $22 million in exchange for a lien on substantially all of Trigeant Ltd.'s assets, including a deed of trust on the refinery. (D12.)

18.   The refinery constituted Trigeant Ltd.'s primary asset.

19.   At this time, AmCap determined that the refinery alone had a liquidation value of $30 million. AmCap believed the refinery and its assets were worth considerably more if properly marketed and sold at fair market value; however, if the refinery had to be foreclosed upon and sold at public auction, as a whole or in pieces, AmCap felt it could easily obtain $30 million.

20.   On December 15, 2006, Trigeant, Ltd. and AmCap signed a Credit Agreement memorializing the terms of the loan. (D13.)

21.   Trigeant, Ltd. was solvent at the time it executed the Credit Agreement, and the Credit Agreement did not cause it to become insolvent.

22.   The AmCap lien and deed of trust on the refinery was effective against the holder of any judicial lien subsequently obtained against Trigeant, Ltd.

23.   The proceeds from the loan helped Trigeant, Ltd. finance its payment of the First Arbitration Award, and on December 29, 2006, Trigeant, Ltd. paid Plaintiff $17,204,573 in full satisfaction of the First Arbitration Award.

24. Trigeant, Ltd. and Plaintiff signed a Release and Satisfaction with regard to the First Arbitration Award. (D25.)

**D.  Trigeant, Ltd.'s Default on the AmCap Loan**

25. On May 19, 2006, prior to entering into the AmCap loan agreement, Trigeant, Ltd. executed a Processing Agreement with Texas Asphalt Refining Company (TARCO).

26. The Processing Agreement required that TARCO pay a fixed per barrel rate for processing crude at the refinery, and it required a minimum monthly quota which had to be paid regardless of whether any crude oil was processed.  This "take or pay" arrangement guaranteed Trigeant, Ltd. minimum annual revenue of $21.6 million.

27. The TARCO Processing Agreement expired in May 2007.

28. Trigeant, Ltd. continued to process crude for TARCO pursuant to the Processing Agreement and sought an extension of the agreement.  However, in the Fall of 2007, TARCO indicated that it would not renew the Processing Agreement because market forces had driven down profit margins to unacceptable levels. There were also allegations that Trigeant, Ltd. soured the relationship by attempting to charge TARCO for capital improvements at the refinery.  At this point, Trigeant, Ltd. no longer had a secured revenue stream.

29. As of result, Trigeant, Ltd. breached one of its financial covenants with AmCap. This breach constituted an "event of default" under the Credit Agreement.

30. By the third quarter of 2007, Trigeant, Ltd.'s financial picture had become unacceptable to AmCap.

31. Steve Roos negotiated a cure to Trigeant, Ltd.'s loan default, but Trigeant Ltd.'s equity holders were unwilling to invest additional money in the business. Therefore, Trigeant, Ltd. was unable to meet AmCap's requirements for the proposed debt restructuring.

32. On October 9, 2007, AmCap formally notified Trigeant, Ltd. that the loan was in default and threatened foreclosure. (D35.)

33. On November 8, 2007, AmCap formally notified Trigeant, Ltd. that it would accelerate the debt under the terms of the Credit Agreement. (D39.)

34. On November 20, 2007, AmCap gave Trigeant, Ltd. notice that it intended to foreclose on the refinery. (D40.)

**E. BTB's Purchase of the AmCap Loan and Lien**

35. Following AmCap's notice of default in October 2007, Harry Sargeant, III approached the other Trigeant, Ltd. equity holders (James Sargeant, Dan Sargeant, and Harry Sargeant, II) to request permission to put together a deal on his own to take control of the refinery. The equity holders granted Harry Sargeant, III permission to do so.

36. Harry Sargeant, III approached his longtime business associate, Mustafa Abu Naba, about financing a NewCo to serve as an acquisition vehicle to purchase the refinery out of foreclosure.

37. Mr. Abu Naba was a dominant purveyor of asphalt throughout the Caribbean, and the refinery would enhance the vertical integration of his businesses. His businesses relied on third-party suppliers of asphalt, and he desired a preferred business relationship with an asphalt refinery on the Texas Gulf Coast.

38. The refinery also provided vertical integration for Harry Sargeant, III's asphalt and crude oil shipping businesses which could increase profits.

39. Control over the refinery permitted Harry Sargeant, III and his affiliated entities to obtain a preferred price from third-party asphalt suppliers. With the ability to turn the refinery on and off, Harry Sargeant, III and his affiliated entities could influence market prices. Asphalt suppliers would be willing to supply them with asphalt at a reduced price if they agreed not to produce.

40. In October 2007, Harry Sargeant, III met with Myung Yi of AmCap to discuss the possibility of purchasing the refinery (after foreclosure by AmCap) through an entity either wholly or partially owned by Harry Sargeant, III.

41. Kevin Kirkeide, who Harry Sargeant, III selected to manage the NewCo, also attended the meeting with Myung Yi.

42. By November 19, 2007, the parties had reached a tentative agreement on the sale of the refinery. The plan was for an entity controlled by Harry Sargeant, III to purchase the refinery from AmCap for the total outstanding balance of the loan following a publicly held foreclosure sale at which AmCap would enter a credit bid equal to all amounts due and owing under the loan at that time. (P82.)

43.  On December 10, 2007, BTB was formed to serve as the acquisition vehicle for the refinery purchase.  Harry Sargeant, III was named the sole owner and member and had full control over the company's operations.

44.  That same day, AmCap and BTB executed an Agreement Regarding Sale of Property and BTB deposited $8 million into an escrow account as a deposit on the refinery. (P99.)

45.  Pursuant to the Agreement Regarding Sale of Property, AmCap agreed to foreclose on the property and enter a credit bid at the foreclosure sale.  If AmCap's credit bid constituted the highest bid at the foreclosure sale, AmCap agreed to designate BTB as the entity to take title to the refinery at closing.

46.  BTB requested that the foreclosure sale be held on January 1, 2008 because it believed there would be less chance of other bidders on that day.

47.  AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale price of the refinery.  Because it had a guaranteed buyer, AmCap agreed to hold the sale on January 1, 2008.

48.  AmCap no longer viewed Trigeant, Ltd. as a going concern because of the expiration of the TARCO agreement.  Nevertheless, AmCap still considered the refinery's liquidation value to be between $27.6 and $30 million.  AmCap believed it could obtain this amount through a forced sale of the refinery, either as a whole or broken up and sold off in its component pieces.  AmCap was confident that it could recoup the outstanding loan balance of approximately $22 million, with or without BTB. (P7.)

49.  In the event that AmCap was not the highest bidder on January 1, 2008, the Agreement Regarding Sale of Property required AmCap to return the $8 million deposit to BTB.

50.  Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the refinery to purchasing the loan and lien from AmCap.  By substituting itself as the foreclosing creditor, BTB would have more control over the foreclosure process and the outcome.

51.  In early December 2007, BTB brought the idea of a note purchase to AmCap.  AmCap felt that this was the cleanest way for it to get paid so it agreed to the change in plan.

52.  BTB and AmCap negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB.

53. In exchange for AmCap's assignment of its rights and obligations under the Credit Agreement and Deed of Trust, BTB agreed to pay AmCap the outstanding loan balance ($22,364,562.06), less the amount of any interest payments made by Trigeant, Ltd. (P100.)

54. On December 23, 2007, Harry Sargeant, III gave the go ahead for the note purchase. (P8, D129.)

55. On December 27, 2007, Steve Roos of Trigeant, Ltd. made an interest payment to AmCap in the amount of $521,143.41. (P86.) This resulted in a direct reduction of the purchase price of the AmCap loan for BTB.

56. On December 28, 2007, BTB and AmCap executed the Assignment and Acceptance Agreement (P100), which superseded the Agreement Regarding Sale of Property, and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the note.

57. BTB then cancelled the previously scheduled January 1, 2008 foreclosure sale.

**F.    BTB's Foreclosure on the Refinery**

58. Following the sale of the AmCap loan and lien to BTB, Trigeant, Ltd. continued in default under the Credit Agreement.

59. BTB did not offer Trigeant, Ltd. an opportunity to cure the default, nor did Trigeant, Ltd. propose any cure.

60. There were never any discussions or negotiations between BTB and Trigeant, Ltd. regarding a rehabilitation plan.

61. BTB never planned to rehabilitate Trigeant, Ltd.; rather, it intended to take control of the refinery through foreclosure.

62. Harry Sargeant, III believed that once the TARCO processing agreement expired, Trigeant, Ltd. was essentially dead.

63. Harry Sargeant, III and the other Trigeant, Ltd. equity holders were not interested in putting more money into Trigeant, Ltd.

64. BTB initially rescheduled the foreclosure sale for February 5, 2008, the first Tuesday in February. (D190, D200.)

65.     BTB then rescheduled the foreclosure sale for March 4, 2008, the first Tuesday in March. (D193, D201.)

66.     On February 12, 2008, Skip Henkel, the substitute trustee, gave written notice to Trigeant, Ltd. that a non-judicial foreclosure sale would be conducted on March 4, 2008. (D193.)

67.     Notice of the public foreclosure sale was posted at the Nueces County Courthouse. (D207.)

68.     Notice of the foreclosure sale was published in the Coastal Bend Daily Legal & Business News on February 15, 2008. (D201.)

69.     Trigeant, Ltd. made no effort to maximize the sale price of the refinery: it did not retain a broker, it did not contact other interested buyers, and it did not advertise the sale.

70.     It was not in BTB's interest to publicize the sale because it wished to buy the refinery at the lowest possible price.

71.     On March 4, 2008, the substitute trustee conducted a public auction on the steps of the Nueces County Courthouse.

72.     BTB was the only bidder present at the sale.

73.     BTB placed a credit bid of $22,565,193.55, equal to all amounts due and owing under the loan at that time.

74.     The foreclosure sale was conducted in accordance with the provisions of the Texas Property Code, Section 51.002.

75.     Plaintiff did not learn about the foreclosure sale until after it occurred.

76.     BTB, Trigeant, Ltd., and Harry Sargeant, III initially concealed the foreclosure sale and the relationship between BTB and Harry Sargeant, III.

77.     The Port Authority of Corpus Christi did not learn of the sale until November 2008, when it received notice from U.S. Customs and Border Control.

78.     The neighboring Citgo refinery (a subsidiary of Plaintiff), which leased storage tanks from Trigeant, Ltd., did not learn about the change in ownership until January 2009 when there was an issue with its employees' access badges for the Trigeant, Ltd. refinery.

79.   On May 26, 2008, at the Second Arbitration Proceedings before the International Court of Arbitration, Harry Sargeant, III testified that he did not have any interest in, control over, or connection to BTB, either directly or indirectly. (P90.)

80.   At the time of the transfer of the refinery, Trigeant, Ltd. was insolvent, meaning that the sum of its debts was greater than all of its assets at a fair valuation.

## G.   The Transition Agreement

81.   After BTB's purchase of the refinery on March 4, 2008, Trigeant, Ltd. and BTB negotiated a Transition Agreement by which Trigeant, Ltd. operated the refinery on behalf of BTB for an administrative fee equal to 10% of the cost of the employees' compensation and benefits. (D58, D59, D60, D62, D64, D65, D69, D72, P162.)  BTB was also required to reimburse Trigeant, Ltd. for any expenditures incurred to maintain, improve, lease, and insure the land. (P162.)

82.   Trigeant, Ltd. maintained its same employees, and there was little or no change in the management and operation of the refinery.

83.   Trigeant, Ltd. refined its own petroleum stocks at the refinery during the transition period and fulfilled its existing contracts. (D45, D45a.)

84.   BTB's Kevin Kirkeide managed any new contracts and new business.

85.   The Transition Agreement expired on June 30, 2008, but Trigeant, Ltd. continued operating the refinery for BTB until September 8, 2008, when BTB foreclosed on all of Trigeant, Ltd.'s remaining property at the refinery.

86.   After September 8, 2008, Trigeant, Ltd.'s employees were offered employment with BTB.  Steve Roos continued to serve as the manager of Trigeant, LLC, but was no longer in charge of the refinery's operations.

## H.   BTB's Foreclosure on Trigeant's Remaining Assets

87.   On February 7, 2008 (before the foreclosure on the refinery), Trigeant, Ltd. and BTB entered into an amendment to the Credit Agreement that granted Trigeant, Ltd. a $16 million line of credit secured by the same Trigeant, Ltd. assets as in the original Credit Agreement. (D48, D49.)

88.   BTB loaned Trigeant, Ltd. $3,950,000 for operating expenses and capital improvements at the refinery.

89.     The capital improvements at the refinery included the installation of a new gas meter, the completion of a railcar unloading rack, and ongoing work on a truck loading rack. (P40.)

90.     After the March 4, 2008 foreclosure sale, Trigeant, Ltd. continued to own personal property located at the refinery, including equipment, accounts, contracts and the permits necessary to operate the refinery.

91.     On June 25, 2008, BTB proposed that Trigeant, Ltd. turn over all its remaining personal property and intangibles secured by the Amended Credit Agreement in full satisfaction of Trigeant Ltd.'s remaining debts and obligations to BTB. (D63, D66, D67.)

92.     Trigeant, Ltd. failed to respond to BTB's proposal.

93.     BTB gave Trigeant, Ltd. notice of its intent to foreclose on Trigeant Ltd.'s remaining assets. (D68, D73.)

94.     On September 8, 2008, BTB held a public auction at which it entered a credit bid for all of Trigeant, Ltd.'s remaining personal property and intangibles at the refinery. (D71.)

**I.      Value of the Refinery at the Time of the Transfer**

95.     The Court received evidence of a wide range of values for the refinery.

96.     As a going concern and assuming the completion of certain capital improvements that were under way at the time of the transfer, the refinery was potentially worth $160 million.

97.     In 2006, Trigeant, Ltd. estimated the fair market value of the refinery at $68 million.

98.     On December 10, 2007, AmCap's Blacktop Report placed the break-up/liquidation value of the refinery at $27.6 million; the orderly liquidation value of the refinery at $30–40 million, depending on market conditions; the fair market value at $45 million; and the replacement cost at $74.6 million.

99.     The considerable variations in the estimates of the refinery's value are due to the variability of the factors considered—such as current market conditions, the time of the year, whether the refinery was being marketed as a going concern, whether the sale was voluntary or involuntary, and whether the refinery was intact and operational or shuttered and being sold off in pieces.

100. The Court finds the testimony of AmCap's corporate representative, Myung Yi, and the AmCap Blacktop Report credible and persuasive with regard to valuation. AmCap's decision to loan Trigeant, Ltd. $22 million was based primarily on its ability to recover its investment, if needed, through a forced sale of the refinery. In other words, AmCap had a strong incentive to provide an accurate, albeit conservative, valuation of the refinery.

101. Because Trigeant, Ltd. was in default on its loan and the refinery was in foreclosure, the Court finds that the proper valuation of the refinery at the time of the transfer was its liquidation value, not its fair market value.

102. The Court finds that, at the time of the transfer, the refinery had a value in excess of the lien.

## J.   Insider Status

103. Harry Sargeant, III holds a 29.5% ownership interest in Trigeant Holdings, LLC.

104. Harry Sargeant, III's immediate family members (James Sargeant - brother, Daniel Sargeant - brother, and Harry Sargeant, II - father) hold the remaining ownership interest in Trigeant Holdings, LLC.

105. At the time of the transfer of the refinery, Harry Sargeant, III served as the manager of Trigeant Holdings, LLC. (D22.)

106. Trigeant Holdings, LLC is the general partner of and exerts full control over Trigeant Holdings, Ltd.

107. At the time of the transfer, Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III and his immediate family members (James Sargeant, Daniel Sargeant, and Harry Sargeant, II).

108. At the time of the transfer, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC. Accordingly, Trigeant Holdings, Ltd. controlled Trigeant, LLC.

109. Trigeant, LLC is the general partner of Trigeant, Ltd. Accordingly, Trigeant, LLC exercised 100% control over Trigeant, Ltd.

110. In sum, Trigeant Holdings, LLC exerted control over Trigeant Holdings, Ltd., which in turn controlled Trigeant, LLC, which in turn controlled Trigeant, Ltd.

111.   The Trigeant, Ltd. equity holders, which consisted of Harry Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II, were related, shared the same small office, and worked very closely together.

112.   The other Trigeant, Ltd. equity holders deferred to Harry Sargeant, III on issues regarding Trigeant, Ltd.'s management.  They had little interest in the operations of Trigeant, Ltd. and were not active in its management.

113.   Harry Sargeant, III had ultimate managerial responsibility for Trigeant, Ltd.'s operations and thus exerted control over Trigeant, Ltd. (P49.)

114.   Harry Sargeant, III possessed intimate knowledge of Trigeant, Ltd.'s business and financial affairs.

115.   Harry Sargeant, III was the 100% owner and sole member of BTB.

116.   Kevin Kirkeide served as BTB's manager and handled the company's day-to-day operations; however, Harry Sargeant, III had ultimate managerial control over BTB and directed Mr. Kirkeide with regard to BTB's important business decisions.

117.   Harry Sargeant, III sat on both sides of the transaction involving the transfer of the refinery from Trigeant, Ltd. to BTB.

## CONCLUSIONS OF LAW

### A.      The Court Has Personal Jurisdiction over Harry Sargeant, III

1.      The Court concludes that it has specific jurisdiction over Harry Sargeant, III.

2.      In determining whether it may exercise personal jurisdiction over a defendant, a Court must consider (1) whether the defendant has sufficient minimum contacts with the forum state, and (2) whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945); *see also Alpine View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

3.      For specific jurisdiction, minimum contacts may be established by demonstrating that the defendant purposefully directed his activities at the forum state and the plaintiff's cause of action arises out of these activities.  *See Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

4.      Harry Sargeant, III purposefully directed his activities at Texas, and this litigation results from damages that arise out of those activities:  he came up with the plan to purchase the Texas refinery after a foreclosure sale by AmCap (FF 35, 36, 40, 42, 44, 45); he formed BTB to purchase the refinery (FF 43); he then negotiated and ordered the purchase of the loan and lien from AmCap (FF 50, 51-54); and he controlled the foreclosure on the refinery through BTB (FF 58-65, 71-73).  The transfer of the refinery to BTB prevented Plaintiff from collecting on its Second Arbitration Award against Trigeant, Ltd.  Accordingly, Plaintiff has demonstrated that Harry Sargeant, III has sufficient minimum contacts with Texas. *See Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 728 (Tex. App. Houston [1st Dist.] 2005).

5.      Once a plaintiff establishes minimum contacts, the burden shifts to the nonresident defendant to show that asserting jurisdiction would not offend traditional notions of fair play and substantial justice. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 245 (5th Cir. 2008); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006); *Wien Air Alaska*, 195 F.3d at 215.

6.   Texas has a significant interest in the subject matter of the litigation (the refinery), and bringing all defendants together in one action leads to a more efficient resolution of the controversies.  There is a burden on Harry Sargeant, III to litigate in Texas; however, the balance of interests favors this Court's exercise of jurisdiction over Harry Sargeant, III.

7.   The fiduciary shield doctrine does not apply in this case.  The Fifth Circuit has concluded that when an individual exerts such domination and control over a company that in reality they are the same, the exercise of jurisdiction over the individual is appropriate. *See Stuart v. Spademan*, 772 F.2d 1185, 1198 (5th Cir. 1985).  Additionally, where an individual acts in his own self-interest, rather than that of the corporation, he is not entitled to the protection of the fiduciary shield doctrine. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902–03 (2d Cir. 1981).  Harry Sargeant, III was the 100% owner and sole member of BTB.  He had full control over BTB's operations and directed and controlled its decisions. Additionally, he acted in his own interest in facilitating and directing the transfer of the refinery to BTB (FF 6, 39-40, 42-46, 50-56, 114, 116).

8.   Accordingly Harry Sargeant, III's Motion for Judgment on Partial Findings (D.E. 232) is DENIED.

**B.    The March 4, 2008 Foreclosure Sale Constituted a Transfer of an Asset**

9.   TUFTA Section 24.002 provides definitions for several statutory terms which are relevant to the Court's inquiry into whether the March 4, 2008 foreclosure sale constituted a transfer of an asset.

> Transfer:  "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. § 24.002(12)
> Asset:  "property of a debtor, but the term does not include . . . property to the extent it is      encumbered by a valid lien . . . ." § 24.002 (2).
> Valid Lien:  "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." § 24.002(13)

10.  An alleged fraudulent transfer of property is exempt from TUFTA "to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien." *Mullins v. Testamerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009).

11.  When only part of a property's value is encumbered by a valid lien, the value the debtor maintains in the encumbered property in excess of the encumbering lien (the debtor's equity) constitutes an asset subject to TUFTA's anti-fraud provisions. *Telephone Equipment Network, Inc. v. TAS/Westchase Place, Ltd.*, 80 S.W.3d 601, 610, n.6 (Tex. Ct. App. 2002) (collecting cases).

12.  In determining whether property constitutes an asset, the Court considers the property's value at the time of the transfer. *See, e.g., United States ex. rel. Small Business Admin. v. Comm. Tech., Inc.,* 354 F.3d 378, 387 (5th Cir. 2003).

13.  Because the refinery was in foreclosure at the time of the transfer, in determining its value, the Court considers the property's liquidation value, not its fair market value.

14.  The Court found that, at the time of the transfer, the refinery had a liquidation value in excess of the lien (FF 102).  Therefore, the entire value of the refinery was not encumbered by a valid lien.

15.  The Court does not need to determine whether the debtor received less than reasonably equivalent value for the asset, as the TUFTA definitions of "transfer" and "asset" do not include the term reasonably equivalent value. §§ 24.002(2)&(12).

16.  The omission of reasonably equivalent value from the definitions of "transfer" and "asset" cannot be considered an accident. *See Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 338 (1994) ("it is generally presumed that [a legislature] acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (quotations omitted)); *Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose.  Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." (quotations and citations omitted)).

17.  The Court concludes that the foreclosure sale constituted a transfer of an asset.

**C.    Section 24.006(b):  Constructive Fraud - Insider Preference**

18.  TUFTA Section 24.006(b) prohibits a category of fraudulent transfers known as "insider preferences."

19. To establish a claim for constructive fraud under Section 24.006(b), a creditor must demonstrate the following elements:

    (1)    a transfer;
    (2)    to an insider;
    (3)    for an antecedent debt;
    (4)    insolvency of the debtor at the time of the transfer; and
    (5)    insider had reasonable cause to believe that the debtor was insolvent.

20. For Plaintiff to establish a claim for constructive fraud under Section 24.006(b), it must demonstrate that BTB was an insider of Trigeant, Ltd.

21. The test for determining insider status is to look at (1) the closeness of the relationship between the transferee (BTB) and debtor (Trigeant, Ltd.), and (2) whether the transfer constituted an arm's length transaction. *In re Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App. – Tyler 2000, no pet.).

22. The Court first considers Harry Sargeant, III's relationship with Trigeant, Ltd. A person who exercises control over the debtor is always considered an insider. § 24.002(7)(C)(v). Harry Sargeant, III exercised control over Trigeant, Ltd. (FF 103-114).

23. A person's intimate knowledge of a partnership's business affairs is highly probative of an insider relationship. *See In re Wren Alexander Investments, LLC*, No. 08-52914-RBK, 2011 WL 748131, at *9–10 (Bankr. W.D. Tex. Feb. 23, 2011) (citing *Putman v. Stephenson*, 805 S.W.2d 16, 19 (Tex. App. Dallas 1991)). Harry Sargeant, III had intimate knowledge of Trigeant, Ltd.'s business and financial affairs (FF 114).

24. Another indicator of an insider relationship is when a person is a relative of the general partner or other person in control of the debtor. § 24.002(7)(C)(ii). In the case at hand, the Sargeant family owned Trigeant, Ltd. Harry Sargeant, III was not only an equity partner and in control of Trigeant, Ltd., but he was related to the other equity partners.

25. An arm's length transaction is a transaction between two unrelated and unaffiliated parties. *Black's Law Dictionary* 1635 (9th ed. 2009). In this case, Harry Sargeant, III sat on both sides of the transaction (FF 118) so the transfer of the refinery was between related and affiliated parties and thus not at arm's length.

26. Therefore, the Court concludes that Harry Sargeant, III was an insider of Trigeant, Ltd.

27. The Court next considers BTB's relationship with Trigeant, Ltd.  BTB had a close relationship with Trigeant, Ltd. because its 100% owner and sole member was an insider of Trigeant, Ltd.  Harry Sargeant, III was in control of both BTB and Trigeant, Ltd. (FF 113-116).  BTB thus had intimate knowledge of Trigeant Ltd.'s business and financial affairs.  As stated above, the transfer of the refinery was not at arm's length.  Accordingly, the Court concludes that BTB was an insider of Trigeant, Ltd.

28. The other constructive fraud factors—that the transfer was for an antecedent debt, that the debtor was insolvent at the time of the transfer, and that the insider had reasonable cause to believe the debtor was insolvent—were uncontested by Defendants.

29. Plaintiff established by a preponderance of the evidence all the elements for a claim of constructive fraud under TUFTA Section 24.006(b).

**D.    Section 24.010(a)(3):  One-Year Statute of Limitations for Insider Preference**

30. Under TUFTA, an action for constructive fraud under Section 24.006(b) "is extinguished unless action is brought . . . within one year after the transfer was made." § 24.010(a)(3).

31. The foreclosure sale occurred on March 4, 2008.  Plaintiff did not file its Third Amended Complaint naming Harry Sargeant, III as a Defendant until July 23, 2010 (D.E. 120).  Thus, Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is untimely, unless Plaintiff can show that it relates back to the Original Complaint.

32. Under FED. R. CIV. P. 15(c)(1)(C), a plaintiff who files suit within the limitations period may amend the complaint to change a defendant's name or substitute a correctly named defendant for one named by mistake, so long as (1) the amended complaint asserts a claim or defense arising out of the same conduct, transaction, or occurrence set out—or attempted to be set out—in the original complaint; (2) the newly named defendant had notice of the suit during the period for service of process under FED. R. CIV. P. 4(m); and (3) the newly named defendant knew or should have known that, but for a mistake, he would have been named within the applicable limitations period. *Krupski v. Costa Crociere S. p. A.*, --- U.S. ----, 130 S.Ct. 2485, 2496 (2010); *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998).

33. Plaintiff cannot satisfy the third element.  "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing [its] original

complaint." *Krupski*, 130 S. Ct. at 2493. In the case at hand, there is no evidence that Harry Sargeant, III knew or should have known that Plaintiff was targeting him as a defendant, or that he would have been named as a defendant but for a case of mistaken identity.

34. Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is dismissed for failure to comply with the applicable statute of limitations.

**E.      Sections 24.005(a)(2) and 24.006(a):  Constructive Fraud**

35. To establish a claim for constructive fraud under Sections 24.005(a)(2) and 24.006(a), a creditor must prove the following elements for each transaction:
     (1)      the transaction constituted a transfer;
     (2)      the debtor received less than reasonably equivalent value in exchange for the transfer; and
     (3)      one of the following:
              (i)      the debtor was insolvent at the time of the transfer or as a result of the transfer;
              (ii)     the debtor was left with unreasonably small capital after the transfer; or
              (iii)    at the time of the transfer, the debtor intended to incur debts beyond its ability to pay.

36. Under TUFTA, "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, non-collusive foreclosure sale . . . ." § 24.004(b); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).

37. A debtor receives reasonably equivalent value for its property transferred through a foreclosure sale if the value received falls "within the range of values for which the transferor would have sold the assets in an arm's length transaction." § 24.004(d).

38. Even if the foreclosure sale was collusive, the transfer of the refinery was for a value within the range of values for which the refinery would have sold in an arm's length transaction pursuant to § 24.004(d).

39. The lowest price at which the refinery would have sold in a regularly conducted, non-collusive foreclosure sale is the outstanding loan balance of approximately $22.5 million. In the foreclosure sale context, it is not uncommon for a foreclosing creditor to enter a "credit bid" equal to the outstanding balance of the

loan. Thus, $22.5 million establishes the bottom end of the range of what would be considered a reasonably equivalent value for the refinery.

40. Accordingly, Plaintiff's constructive fraud claim under TUFTA Sections 24.005(a)(2) and 24.006(a) fails.

## F. Section 24.005(a)(1) and (b): Actual Fraud

41. To establish actual fraud under Section 24.005(a)(1), the creditor must prove by a preponderance of the evidence that the debtor made the allegedly fraudulent transfer with the "actual intent to hinder, delay, or defraud any creditor of the debtor."

42. Section 24.005(b) provides a list of eleven nonexclusive badges of fraud that the Court may consider in determining whether the debtor acted with actual intent to defraud:

    (1)    the transfer or obligation was to an insider;
    (2)    the debtor retained possession or control of the property transferred after the transfer;
    (3)    the transfer or obligation was concealed;
    (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
    (5)    the transfer was of substantially all the debtor's assets;
    (6)    the debtor absconded;
    (7)    the debtor removed or concealed assets;
    (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
    (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
    (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and
    (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

43. The existence of several badges of fraud has been found to constitute an inference of fraud, a strong case of fraud, or to even shift the burden of proof to the defendant. *See, e.g.*, *Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir. 1998) (holding that the presence of multiple badges of fraud shifts the burden to defendant to show by a preponderance of the evidence that it had a legitimate purpose in making the transfer); *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App. 2009) ("An individual badge of fraud is not conclusive, but a concurrence of many badges in the same case will always make out a strong case

of fraud." (internal quotations and brackets omitted)); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 300 (W.D. Tex. 2009) ("Proof of four to five badges of fraud has been found sufficient in several reported cases.").

44.    In the case at hand, the evidence supports a finding of at least seven of the statutory badges of fraud: the transfer was to an insider (FF 103–118, CL 27); the debtor retained possession or control over the property after the transfer for a period of time (FF 81-86); the transfer was concealed (FF 69, 70, 72, 75-79); before the transfer was made, the debtor had been sued or threatened with suit (FF 14); the transfer of the refinery constituted substantially all of the debtor's assets (FF 18); the debtor was insolvent or became insolvent shortly after the transfer was made (FF 80); and the transfer occurred shortly before a substantial debt (the Second Arbitration Award) was incurred (FF 15).

45.    The Court concludes that the debtor, Trigeant, Ltd., acted with actual intent to hinder, delay, or defraud Plaintiff.

## G.    Section 24.009(a):  Good Faith Defense

46.    Under Section 24.005(a)(1), a transfer is not voidable against someone who took the property in good faith and for reasonably equivalent value. *See, e.g.*, *Phillips v. B.R. Brick and Masonry, Inc.*, 2010 WL 3564820, at *4 (Tex. App., 1st Dist. Houston, Sept. 10, 2010); *In re IFS Financial Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).

47.    BTB did not carry its burden with regard to the good faith element.  Consequently, BTB may not invoke the good faith defense.

## H.    TUFTA Remedies

48.    TUFTA Section 24.008 provides the following remedies for creditors who have been defrauded under the Act:

> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or
> (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>> (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

property;
(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
(C) any other relief the circumstances may require.

49.     "TUFTA was designed to prevent a debtor from defrauding its creditors by moving assets out of reach. To accomplish that end, TUFTA permits a creditor, under certain circumstances, to set aside a debtor's fraudulent transfer of assets." *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App. Houston [14th Dist.] 2004) (internal citation omitted).

50.     "Setting aside a fraudulent transfer is an equitable remedy." *Jackson Law Office v. Chappell*, 37 S.W.3d 15, 26 (Tex. App. Tyler 2000).  A district court exercising its equitable powers must weigh the interests of the parties and the public in determining whether equitable relief should be granted. *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1998).

51.     The Court concludes that avoidance of the transfer is the most appropriate remedy in this case.  The Court is concerned about the effects of unwinding the transfer after more than four years.  However, given the evidence regarding the wide range of values for the refinery in a foreclosure situation, it would be speculative to set a value on the refinery at the time of the transfer.  Thus, a money judgment is not appropriate.

52.     The setting aside of a fraudulent transfer restores the debtor and creditor to their respective positions as they existed before the transfer and permits the creditor to enforce its legal rights against the debtor, as if no conveyance had ever been made. *First Nat. Bank of Detroit v. Skidmore*, 267 S.W. 1051, 1055 (Tex. App. Texarkana 1924).  Before the transfer, BTB had a lien on the refinery.  Plaintiff requests that BTB's lien be equitably subordinated to its claim.

53.     Equitable subordination elevates the status of the creditor against other claimants above what its position was at the time of the transfer.  The Fifth Circuit has enunciated a four-prong test for determining when equitable subordination is appropriate:

            (1) the claimant [BTB] must have engaged in inequitable conduct;
            (2) the misconduct must have resulted in injury to the creditors of the bankrupt [Plaintiff] or conferred an unfair advantage on the claimant [BTB]; (3) equitable subordination of the claim must not be inconsistent with the provisions of [TUFTA]; and (4) a claim should be subordinated only to the extent necessary to offset the harm

which the debtor or its creditors have suffered as a result of the
inequitable conduct.

*In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008); *In the Matter of
Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile
Steel Corp.*, 563 F.2d 692, 700 (5th Cir. 1977) (internal citations omitted).

54.     At the time BTB purchased the loan and lien from AmCap, AmCap was in the
process of foreclosing on the refinery.  Had BTB not purchased the loan from
AmCap, AmCap would have foreclosed on the refinery and any recovery by
Plaintiff on the Second Arbitration Award would have been limited to the value
received by AmCap in excess of the outstanding loan balance at the time of the
foreclosure sale.  Because a claim should be subordinated only to the extent
necessary to offset the harm which the creditor suffered, the Court concludes that
Plaintiff is not entitled to the equitable subordination of BTB's lien on the
refinery.

55.     The Court declines to consider Plaintiff's sham to perpetrate a fraud claim, which
sought to impose joint and several liability on all Defendants for the entire amount
of the Second Arbitration Award, because the Court has concluded that a money
judgment is not appropriate in this case.

## CONCLUSION

For the reasons stated above, the Court concludes that the transfer of Trigeant,

Ltd.'s Corpus Christi refinery to BTB violated TUFTA, and Plaintiff is entitled to entry

of judgment in its favor.  The Court orders that the fraudulent transfer be set aside and

ownership of the refinery be returned to Trigeant, Ltd.  The Court will set a hearing to

address attorney fees.

ORDERED this 7th day of August, 2012.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:09-CV-38 |
| | § | |
| TRIGEANT, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER ON TRIGEANT, LTD.'S OPPOSED MOTION TO ENFORCE JUDGMENT

On the 25th day of March, 2013, the Court considered Trigeant, Ltd.'s Opposed

Motion to Enforce Judgment (D.E. 308). After considering the motion, the response, the

reply, the sur-reply, and the arguments of counsel, the Court is of the opinion that the

Motion should be GRANTED.

It is ORDERED that:

1. BTB Refining, LLC return to Trigeant, Ltd. possession of all property foreclosed

   upon in the March 4, 2008 foreclosure sale during the pendency of this cause on

   appeal.

2. BTB Refining, LLC deposit any and all funds received from Freeport

   Commodities Trading and Marketing, LLC under the Tank Lease Agreement into

   an operating account of the refinery (as specified below) and as identified and

   directed by Trigeant, Ltd.

   Bank Name:       International Bank of Commerce
   Bank Address:    1200 San Bernardo Ave.
                    Laredo, Texas 78042

```
ABA #:              XXXXX2528
SWIFT Code:         XXXXUS44
Account #:          XXXXXX4535
Account Name:       Trigeant, Ltd.
```

3.  Trigeant, Ltd. spend such funds only for labor, safety, maintenance, insurance, utilities, compliance, taxes, and capital improvements at the facility.

4.  Trigeant, Ltd. maintain an accounting of the funds received and the operating expenses paid, and provide such accounting to BTB Refining, LLC on the 15th of each month.

ORDERED this 27th day of March, 2013.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

EXHIBIT "C"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **PDVSA PETROLEO, S.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 2:09-CV-00038** |
| | § | |
| **TRIGEANT, LTD.,** | § | |
| **BTB REFINING, L.L.C., and** | § | |
| **HARRY SARGEANT, III,** | § | |
| | § | |
| **Defendants.** | § | |

---

## ORDER DENYING BTB REFINING, LLC'S EMERGENCY MOTION FOR STAY AND MODIFYING ORDER ON TRIGEANT, LTD'S MOTION TO ENFORCE JUDGMENT

---

On the 2nd day of April, 2013, the Court considered BTB Refining, LLC's Emergency Motion for Stay. (D.E. 335.) After considering the motion and the arguments of counsel, the motion is DENIED, and the Court's Order Granting Trigeant, Ltd.'s Motion to Enforce Judgment (D.E. 308) is MODIFIED AS FOLLOWS:

It is ORDERED that:

1. During the pendency of this cause on appeal, Trigeant, Ltd. ("Trigeant") shall remain in possession of all property foreclosed upon in the March 4, 2008 foreclosure sale. Notwithstanding, BTB shall have the non-exclusive right to use, occupy and have access to the foreclosed property for the sole purpose of fulfilling all of its rights and contractual obligations under the Tank Lease Agreement dated December 1, 2012 entered between BTB as Lessor and Freepoint Commodities Trading and Marketing, LLC ("Freepoint") as Lessee.

2.    BTB shall immediately deposit any and all funds received from Freepoint which currently remain in its possession, as well as any and all future funds received from Freepoint immediately after their receipt into an operating account ("Escrow Account") established by and in the name of Trigeant.  This Escrow Account shall be used solely for refinery operating expenses arising out of the Tank Lease Agreement as specified below, without setoff or payment of any funds by BTB for any purpose, prior to the deposit of such funds into the Escrow Account.  The Escrow Account shall also be exempt from any state or federal garnishment, or levy or execution proceeding.

| | |
|---|---|
| Bank Name: | International Bank of Commerce |
| Bank Address: | 1200 San Bernardo Ave. |
| | Laredo, Texas 78042 |
| ABA #: | XXXXX2528 |
| SWIFT Code: | XXXXUS44 |
| Account #: | XXXXXX4535 |
| Account Name: | **Trigeant, Ltd.** |

3.    All necessary and reasonable costs associated solely with fulfilling BTB's contractual rights and obligations under the Tank Lease Agreement shall be paid by Trigeant from the Escrow Account to any appropriate vendor or payee, which may include BTB.  Trigeant shall make all such payments from the Escrow Account within 5 business days of the presentation of an invoice and all supporting documents by BTB to Trigeant that details said costs and expenses.

4.    The funds held in the Escrow Account shall be paid only for employee salaries and related taxes and withholding obligations, and for operating expenses, safety, maintenance, insurance, utilities, regulatory compliance, and other applicable

local, state or federal taxes, and capital improvements at the facility, and solely as they pertain to or arise from the Tank Lease Agreement.

5. Trigeant shall maintain a detailed accounting of the funds received from BTB and the operating expenses paid, including the supporting documentation provided to Trigeant by BTB, and provide such accounting to BTB and Freepoint by the 15th day of each month.

ORDERED this 4th day of April 2013.

**NELVA GONZALES RAMOS**
**UNITED STATES DISTRICT JUDGE**

**COMPOSITE EXHIBIT "D"**

**From:** Angela Shlyakhov
**Sent:** Wednesday, November 27, 2013 3:45 PM
**To:** 'ckise@foley.com'; 'jmckee@foley.com'; 'mcoffey@foley.com'; 'pgordon@foley.com';
'sodonnell@foley.com'; 'bblackburn@foley.com'; 'apoppe@foley.com'; 'tvillardefrancos@foley.com';
'mmitchell@gardere.com'; 'druckman@gardere.com'; 'fsultan@gardere.com'; 'gcoleman@bclclaw.com';
'cwoodward@bclclaw.com'; 'dtx@bclclaw.com'; 'dgreen@gardere.com'; 'jlevinger@levingerpc.com';
'codavis@bakerdonelson.com'; 'info@welderleshin.com'; 'jorge.c.rangel@rangellaw.com'
**Cc:** DRT; Charles H. Lichtman; 'Lisa Webster (LWebster@bergersingerman.com)'; 'Angela Shlyakhov
(AShlyakhov@bergersingerman.com)'; 'Isaac M. Marcushamer Esq.
(imarcushamer@bergersingerman.com)'; 'Fleta Ann Sellers (FSellers@bergersingerman.com)'; 'Jeffrey S.
Wertman'; Yvonne Brown-Davis
**Subject:** Suggestions of Bankruptcy in Maryland and Texas cases

Good afternoon, counsel,

Kindly see attached pleadings.

## BERGER SINGERMAN

**Angela Shlyakhov**
Paralegal
350 East Las Olas Boulevard | Suite 1000 | Fort Lauderdale FL 33301
*office:* (954) 525-9900 | *direct:* (954) 712-5101 | *fax:* (954) 523-2872
AShlyakhov@bergersingerman.com

in F g+ t 🔊 Please consider the environment before printing this email.

This transmission is intended to be delivered only to the named addressee(s) and may contain information that is confidential, proprietary, attorney work-product or attorney-client privileged. If this information is received by anyone other than the named and intended addressee(s), the recipient should immediately notify the sender by E-MAIL and by telephone at the phone number of the sender listed on the email and obtain instructions as to the disposal of the transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s). Thank you.
*****************************************************************************************************
CIRCULAR 230 DISCLAIMER: This communication does not constitute a "covered opinion" as such term is defined within Circular 230, and does not comply with the requirements for a "covered opinion." We have not conducted, nor have we been asked to conduct, that type of analysis in this communication. To ensure compliance with requirements imposed by the IRS, we must inform you that any U.S. federal tax advice contained in this communication (including any documents or items appended herein) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
*****************************************************************************************************

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

|                                    |     |                            |
|------------------------------------|-----|----------------------------|
| BTB REFINING, L.L.C.,              | )   |                            |
|                                    | )   |                            |
| Plaintiff,                         | )   | Civil Action No. 378773-V  |
|                                    | )   |                            |
| v.                                 | )   |                            |
|                                    | )   |                            |
| TRIGEANT HOLDINGS, LTD.            | )   |                            |
| and TRIGEANT L.L.C.,               | )   |                            |
|                                    | )   |                            |
| Defendants.                        | )   |                            |

### SUGGESTION OF BANKRUPTCY

Defendant, Trigeant, Ltd., would show unto this Court as follows:

1.　　　On November 27, 2013 (the "Petition Date"), Trigeant, Ltd. (the "Debtor") filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Florida, under Case No. 13-38580-EPK.

2.　　　By virtue of the bankruptcy filing, the Debtor's property is subject to the jurisdiction of the United States Bankruptcy Court for the Southern District of Florida.

3.　　　Pursuant to § 362 of Title 11 of the United States Code (the "Bankruptcy Code"), an automatic stay is in effect which enjoins, *inter alia*, the prosecution of the above captioned case against the Debtor.

4.　　　The bankruptcy proceeding has not been dismissed.

5.　　　The filing of this Suggestion of Bankruptcy is not intended to be an appearance in this case on behalf of the Debtor.

Respectfully submitted,

BERGER SINGERMAN LLP

By: /s/ _____
    Charles H. Lichtman (motion for special
    admission pending)

350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
(954) 712-5138 (Telephone)
(954) 523-2872 (Fax)
clichtman@bergersingerman.com

*Counsel for Defendants Trigeant Holdings, Ltd. and
Trigeant, L.L.C.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of November, 2013, I caused true and correct copies of the foregoing Suggestion of Bankruptcy to be served by first-class mail, postage prepaid (with courtesy copies by electronic mail) upon:

> James B. Moorhead, Esq.
> Kate M. Riggs, Esq.
> Steptoe & Johnson LLP
> 1330 Connecticut Avenue, NW
> Washington, D.C. 20036
> jmoorhead@steptoe.com
> kriggs@steptoe.com
>          - and -
> Mark T. Mitchell, Esq.
> Gardere Wynne Sewell LLP
> 600 Congress Avenue, Suite 3000
> Austin, Texas 78701
> mmitchell@gardere.com

/s/ _____

5346225-1

- 2 -

No. 13-40062

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

PDVSA PETROLEO, S.A.,
*Plaintiff-Appellee-Cross-Appellant*,

v.

TRIGEANT, LTD.
*Defendant-Cross-Appellee-Appellant,*

BTB REFINING, L.L.C.
*Defendant-Appellant-Cross-Appellee,*

HARRY SARGEANT, III,
*Defendant-Cross-Appellee*

Appeal from the United States District Court for the
Southern District of Texas

## TRIGEANT, LTD.'S SUGGESTION OF BANKRUPTCY

Defendant-Cross Appellee-Appellant, Trigeant, Ltd., would show unto this Court as follows:

1.      On November 27, 2013 (the "Petition Date"), Trigeant, Ltd. (the "Debtor") filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Florida, under Case No. 13-38580-EPK.

2.      By virtue of the bankruptcy filing, the Debtor's property is subject to the jurisdiction of the United States Bankruptcy Court for the Southern District of Florida.

3.      Pursuant to § 362 of Title 11 of the United States Code (the "Bankruptcy Code"), an automatic stay is in effect which enjoins, *inter alia*, the prosecution of the above

captioned case against the Debtor.

   4.  The bankruptcy proceeding has not been dismissed.

   5.  The filing of this Suggestion of Bankruptcy is not intended to be an appearance in this case on behalf of the Debtor.


   Dated: November 27, 2013   Respectfully submitted,


                 */s/Michael G. Terry*
                 Michael G. Terry
                 Texas Bar No. 19799800
                 Federal ID No. 926
                 **HARTLINE DACUS BARGER DREYER LLP**
                 800 N. Shoreline Blvd.
                 Suite 2000, North Tower
                 Corpus Christi, Texas 78401
                 (361) 866-8000
                 (361) 866-8039 (fax)

                 **ATTORNEY FOR TRIGEANT, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Suggestion of Bankruptcy was filed with the Court via the Court's CM/ECF system, and was served on all parties to this appeal, on this 27th day of November, 2013 via the CM/ECF system.

| Defendants-Appellants: | Counsel: |
|---|---|
| BTB Refining, LLC | Mark T. Mitchell<br>Frederick W. Sultan, IV<br>Deirdre B. Ruckman<br>Debbie E. Green<br>Gardere Wynne Sewell LLP |
| Trigeant, Ltd. | Michael G. Terry<br>Darrell L. Barger<br>Hartline Dacus Barger Dreyer LLP |
| Harry Sargeant, III | *Appellate Counsel*<br>Jeff Levinger<br>Levinger P.C.<br><br>*Trial Counsel*<br>Jorge C. Rangel<br>The Rangel Law Firm, P.C. |

| Plaintiff-Appellee: | Counsel: |
|---|---|
| PDVSA Petroleo S.A. | Christopher O. Davis<br>Baker Donelson, Bearman, Caldwell<br>& Berkowitz, P.C.<br><br>James F. Buchanan<br>Welder Leshin LLP |

/s/Michael G. Terry
Michael G. Terry

5346433-1

CAUSE NO. 2013-38405

| | | |
|---|---|---|
| BTB REFINING, LLC | § | IN THE DISTRICT COURT |
|     *Plaintiff* | § | |
| | § | |
| v. | § | 165th JUDICIAL DISTRICT |
| | § | |
| TRIGEANT, LTD., TRIGEANT, L.L.C., | § | |
| STEPHEN ROOS and | § | |
| HARRY SARGEANT, JUNIOR | § | HARRIS COUNTY, TEXAS |

## SUGGESTION OF BANKRUPTCY

Defendant, Trigeant, Ltd., would show unto this Court as follows:

1.      On November 27, 2013 (the "Petition Date"), Trigeant, Ltd. (the "Debtor") filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Florida, under Case No. 13-38580-EPK.

2.      By virtue of the bankruptcy filing, the Debtor's property is subject to the jurisdiction of the United States Bankruptcy Court for the Southern District of Florida.

3.      Pursuant to § 362 of Title 11 of the United States Code (the "Bankruptcy Code"), an automatic stay is in effect which enjoins, *inter alia*, the prosecution of the above captioned case against the Debtor.

4.      The bankruptcy proceeding has not been dismissed.

5.      The filing of this Suggestion of Bankruptcy is not intended to be an appearance in this case on behalf of the Debtor.

Respectfully submitted,

**HARTLINE DACUS BARGER DREYER, LLP.**

800 N. Shoreline, Suite 2000 -- North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8039 - Fax


By: */s/Michael G. Terry*_____
      MICHAEL G. TERRY
      State Bar No. 19799800

      ATTORNEYS FOR DEFENDANTS
      TRIGEANT, LTD. AND TRIGEANT,
      L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon all counsel of record, by the method of service indicated below, on this the 27th day of November, 2013.

/s/Michael G. Terry
MICHAEL G. TERRY

*Via E-Mail*
Mark T. Mitchell
GARDERE WYNNE SEWELL LLP
600 Congress Avenue, Suite 3000
Austin, Texas 78701

*Via E-Mail*
Deirdre B. Ruckman
Frederick W. Sultan, IV
GARDERE WYNNE SEWELL LLP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201

5346508-1

**EXHIBIT "E"**

-----Original Message-----
From: Charles H. Lichtman
Sent: Wednesday, November 27, 2013 3:36 PM
To: mmitchell@gardere.com; druckman@gardere.com
Cc: Mr. Stephen Roos; Mr. Michael G. Terry Esq.
Subject: Trigeant Ltd. C Chapter 11 Filing

By now you have received the Suggestion of Bankruptcy for Trigeant  Ltd. As you know, the provisions of section 362 of the bankruptcy code invoke the automatic stay.  Given these circumstances, this is to caution that BTB and Harry Sargeant III not take any steps to interfere with property of the estate.  This includes any action that would impede operation if Trigeant's Refinery and Corpus Christi by removing or disabling  the equipment or property at the refinery, including without limitation, landing the roofs.  Thank you.

Sent from my iPhone